DR. GUSTAVO MUÑOZ DÍAZ, Petitioner, v. DISTRICT COURT OF HUMACAO, Respondent.

No. 710.    Argued May 5, 1930.—Decided June 8, 1931.

*L. Llorens Torres* for petitioner. *González Fagundo & González Jr.* for foreclosing creditor in the main action.

MR. JUSTICE TEXIDOR delivered the opinion of the Court.

Pedro Solá Colón instituted, in the District Court of Humacao, a mortgage foreclosure proceeding against Gustavo Muñoz Díaz and his wife, Inocencia René, and exhibited with his complaint several deeds and certificates from the registrar of property in accordance with the provisions of the legislation in force governing such proceeding. He moved for the issuance of a writ demanding payment (*requerimiento*) and warning of a foreclosure sale in case of default. The court issued the writ, which was served by the marshal on Gustavo Muñoz Díaz. The defendants appeared and interposed a demurrer to the complaint for failure to state facts sufficient to constitute a cause of action, which demurrer after a hearing was overruled by the court. After the expiration of the time fixed by the writ, the court, on motion of the plaintiff, directed by an order the sale at public auction of the mortgaged properties.

The defendants filed a motion to amend the minutes of the court in the sense that what had been submitted was a motion to strike out the demurrer and motions to stay the proceeding and set aside the order overruling the demurrer. Thereupon the court made an order declaring that the demurrer could not be considered, as it did not lie in a summary foreclosure proceeding, in accordance with article 175 of the Mortgage Law Regulations.

On March 17, 1930, the plaintiff moved again for a foreclosure sale, which the court granted. On April 11, 1930, the petition for certiorari herein was filed.

Generally speaking, it may be said that the principal ground of this petition is the unconstitutionality of the Mortgage Law Regulations, as claimed by the petitioner. The most serious contention advanced against the validity of said Regulations is that the same were not submitted to the Coun-

cil of State and that this was an essential requirement under the Spanish Constitution.

As this point has been argued quite ably and at first view it impresses one strongly, it deserves to be examined with great interest and care.

What were the functions of the Council of State in regard to the general regulations and instructions?

Without going back to the original organization of the Council, or to the history of the institutions which preceded it, we find in the law of August 17, 1860, a section reading as follows:

"Section 45. The Council of State, sitting in full, shall be heard:
"1. On all regulations and general instructions for the application of the laws and on any amendments made thereto . . ."

The law reorganizing the Council of State was dated April 5, 1904.

According to the above-quoted section the intervention of the Council of State was necessary. But was it necessary for the validity of such regulations and instructions? An answer to this question necessitates an inquiry into the effects produced by the intervention of the Council of State.

Section 65 of the Law of 1860 above cited reads as follows:

"Section 65. In all Royal Decrees and orders issued by the Government with the concurrence of the Council, sitting in full or in Sections, this circumstance shall be so stated, and in the absence of such concurrence, the following formula shall be used: 'The Council in full has been heard, or the Council was heard at a meeting held on . . .' "

This statutory provision clearly shows that the Council had not ceased to be what historically it had always been, namely, a consulting body whose advice the government might or might not follow, and whose views, whether favorable or adverse, did not limit the power of the Executive to enact the regulations. It was a body to give advice or opinion, but without power to make such advice or opinion effective.

The Spanish Constitution of 1812, by its Article 171, vested in the King the power to issue all decrees, regulations, and instructions which he might deem necessary for the execution of the laws. This same function or power appears in subdivision 1 of Article 47 of the Constitution of Spain of 1837, and similarly in Article 45 of the Constitution of 1845. Still more clearly does this power appear in Article 75 of the Constitution of that country of 1869, which provided:

"The King shall have power to make regulations for the enforcement and application of the laws, subject to the requirements therein prescribed."

Subdivision 1 of Article 54 of the Constitution of 1876, which was in force at the time of the enactment of the Mortgage Law and the Regulations involved herein, contained the following among the prerogatives of the King:

"First. To issue such decrees, regulations, and instructions as may be proper for the execution of the laws."

We notice that this Constitution, the supreme law of the nation, adopted subsequent to the Act of August 17, 1860, reorganizing the Council of State, vested in the King the prerogative or power to make the regulations without restrictions or limitations of any kind. We are, therefore, of opinion that no regulations whatever promulgated by a Royal Decree would be void even though the Council of State had not been heard thereon. Moreover, as the Council was merely a consulting body and it was so from the beginning, any adverse report rendered by it against the regulations could not operate to annul the latter.

The Mortgage Law Regulations for the overseas Provinces were rendered binding, valid, and effective by the mere approval thereof and the issuance of the corresponding Royal Decree. Such regulations, however, were promulgated under the following provision:

"The accompanying regulations for the execution of the Mort-

gage Law for the overseas Provinces, are hereby approved to have effect provisionally until such time as after hearing the Council of State the final regulations shall be promulgated.''

Does the foregoing provision render the Regulations void? We think not, and so hold. Although in our opinion the power of the King at that time to issue the Regulations is quite clear, and even if we conceded some effectiveness to the intervention of the Council of State, we think that no doubt could ever have existed as to the power to issue regulations to have effect temporarily, and that this temporary character did not involve a time limitation in the case of any law. Thus the Regulations stood permanently in force, as we think, or provisionally effective, as we are ready to concede for the sake of argument, until the time of the Spanish-American War and the occupation and possession of Puerto Rico by the Government of the United States.

On July 13, 1898, the President of the United States addressed to the Secretary of War a communication from which we transcribe the following paragraph:

''Though the powers of the military occupant are absolute and supreme and immediately operate upon the political condition of the inhabitants, the municipal laws of the conquered territory, such as affect private rights of person and property and provide for the punishment of crime, are considered as continuing in force, so far as they are compatible with the new order of things, until they are suspended or superseded by the occupying belligerent and in practice they are not usually abrogated, but are allowed to remain in force and to be administered by the ordinary tribunals, substantially as they were before the occupation. This enlightened practice is, so far as possible, to be adhered to on the present occasion. The judges and the other officials connected with the administration of justice may, if they accept the supremacy of the United States, continue to administer the ordinary law of the land, as between man and man, under the supervision of the American commander in chief. The native constabulary will, so far as may be practicable, be preserved. The freedom of the people to pursue their accustomed occupations will be abridged only when it may be necessary to do so.''

The above document was published in Puerto Rico. The following paragraph is from General Order No. 1, of October 18, 1898:

"The provincial and municipal laws, in so far as they affect the settlement of the private rights of persons and property and provide for the punishment of crime, will be enforced unless they are incompatible with the changed conditions of Porto Rico, in which event they may be suspended by the department commander. They will be administered substantially as they were before the cession to the United States. For this purpose the judges and all other officials connected with the administration of justice who accept allegiance to the United States will administer the laws of the land as between man and man, but in cases of the nonacceptance of such allegiance, or malfeasance in office, or for other cause, the department commander will exercise his right of removal and the appointment of other officials. To aid in executing the provincial and municipal laws the present local constabulary and police will be preserved as far as practicable and necessary, provided their allegiance to the United States is assured."

Section 8 of the Act of Congress temporarily to provide revenues and a civil government for Puerto Rico, and for other purposes, approved April 12, 1900, provides:

"That the laws and ordinances of Porto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this Act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Porto Rico or by Act of Congress of the United States . . ."

The above Act found the Regulations for the execution of the Mortgage Law for the overseas Provinces in force, whether provisionally or permanently, and thus imparted to them all the effectiveness, all the necessary strength to continue in force in Puerto Rico as a valid law until repealed. The Legislature of Puerto Rico so considered them in amending them by the Acts of March 7, 1912, December 3, 1917,

Act No. 21 of 1923, and other acts, which are predicated upon the existence and validity of such Regulations.

Without attaching to this circumstance more importance than it really has, it is well to remember the communication from the Secretary of War of the United States to the House of Representatives, dated February 25, 1909, wherein, in response to the House Resolution of January 6th of the same year whereby he was required to transmit to that legislative body, for its information, the laws, ordinances, military orders, and decrees affecting Puerto Rico and referred to in section 8 of the Act of Congress of April 12, 1900, already mentioned, the said Secretary included in such legislation the Regulations for the execution of the Mortgage Law for the overseas Provinces.

The next important question to be considered is that relating to the construction given by the petitioner to section 133 of the Mortgage Law and article 175 of said Regulations.

Section 133 of the Mortgage Law reads as follows:

"The execution proceedings shall in no case be suspended on account of the claims of a third person, if not founded on a prior recorded title, nor on account of the death of the debtor or third possessor, nor the bankruptcy or insolvency of any of them."

Article 175 of the Regulations reads thus:

"The summary proceedings referred to in this section can not be suspended by incidental issues or any other *proceeding at the instance of* * the debtor or the third person in possession, nor by any other person appearing as an interested party, excepting in the following cases:

"1. When documentary evidence is produced of criminal proceedings charging the forgery of the mortgage deed the subject of the proceedings, in which a complaint shall have been admitted or an order of prosecution has been issued.

"2. When an action in intervention of ownership is filed, necessarily the title of the ownership of the estate in question recorded in favor of the intervener under a date prior to the record of the

---

* NOTE.—The quoted language in italics, held the correct English translation of the corresponding Spanish text. See *Miranda* v. *Dist. Court*, 41 P.R.R. 616, 619.

claim of the execution creditor and not canceled in the registry being necessarily filed therewith.

"3. When a certificate from the registrar is presented to the effect that the mortgage under which the proceedings are being prosecuted has been canceled, or an authentic copy of the public instrument of the cancellation of the same, bearing a memoradum of its presentation in any of the registries where it is to be noted, executed by the plaintiff or by his predecessors or successors in interest, the transfer in a proper case being also proved by documentary evidence.

"In the first case the suspension shall continue until the criminal proceedings are concluded, and they may then be resumed if the forgery is not established.

"In the second case, it shall continue until the proceedings in intervention shall have been disposed of.

"In the third case, the judge shall order the parties to appear before him for a hearing four days after service of summons; he shall hear the parties, consider the documentary evidence they may present, and render a decision in the form of an order on or before the second day.

"An appeal may be taken from this decision both for a stay and review, if it orders the suspension of the proceedings.

"All other claims that may be brought, either by the debtor or by the third persons in possession and other persons interested, including those involving the nullity of the title or of the proceedings, or the maturity, truth, extinction or amount of the debt, shall be heard in the proper plenary action, without ever producing the effect of suspending or interfering with the execution proceedings. The jurisdiction to take cognizance of this declaratory action shall be determined by the ordinary rules.

"At the time the complaint is filed, in pursuance of the provisions of the preceding paragraph, or during the course of the proceedings, a demand may be made that the effectiveness of the judgment be secured by the retention of all or of a part of the amount to be delivered to the execution creditor . . ."

The petitioner claims that in view of the provisions of section 133 of the Mortgage Law, in every case not included among the four there mentioned, the summary foreclosure proceeding may be suspended. He reminds us that the previous Mortgage Law prescribed that a defendant in a mortgage foreclosure proceeding could plead the eleven defenses

which the former Spanish Law of Civil Procedure allowed. Really, the most important provisions which we find in the former Mortgage Law, in regard to procedure, are set forth in article 141, reading as follows:

"Art. 141. After the expiration of the period fixed for the payment of the debt, the creditor may demand the issuance of a writ of execution to be levied upon all the mortgaged properties whether or not the same are in the possession of one or several third persons, but payment cannot be demanded from the latter except after demand therefor shall have been made upon the debtor and after he has failed to make such payment. Any third person in possession setting up an opposition shall be considered as a party to the proceeding with respect to the mortgaged properties held by him and all process relating to the attachment and sale of said properties shall be served on him and the debtor, and the deed of sale shall be executed by such person or, in default thereof, by the marshal (*de oficio*). The same judge or court having jurisdiction with respect to the debtor, shall be competent to take cognizance of the proceeding. The execution proceedings shall in no case be suspended on account of the claims of a third person, if not founded on a prior recorded title, nor on account of the death of the debtor or third possessor, nor the bankruptcy or insolvency of any of them."

It seems as if the debtor had then, within the foreclosure proceeding, the defenses to which the petitioner refers. According to article 1462 of the Law of Civil Procedure for Cuba and Puerto Rico, these defenses were as follows:

"1. Falsity of the title importing a confession of judgment, or of the act which gave the title this character.

"2. Payment.

"3. Compensation of a net credit appearing in a document importing a confession of judgment.

"4. Prescription.

"5. Composition or respite. '

"6. Promise or agreement to waive demand of payment.

"7. Lack of personal capacity on the part of the execution creditor or his solicitor.

"8. Novation.

"9. Compromise.

"10. An agreement to submit the matter for decision to arbitra-

tors or to amicable compounders, executed with the formalities prescribed by this law.

"11. Lack of competent jurisdiction."

The same article provided that:

"Any other exception which the debtor may plead shall be reserved for a declaratory action, and it shall not prevent the rendition of a judgment of sale."

For the present we must note that the assertion made by the petitioner relative to the eleven defenses cannot be conclusively maintained. After the Mortgage Law went into effect and in view of article 141, there can be no doubt that the exception of composition or respite could not operate to stay the proceedings. The defense based on the existence of an agreement to submit the matter for decision to arbitrators or to amicable compounders would be of no effect whatever at the present time. The defenses predicated on the falsity of the title and payment are recognized by the Mortgage Law Regulations and have not been lost by the debtor, who did not set them up in the present case. The defenses of novation, compromise, and promise or agreement to waive demand for payment, could not within the Mortgage Law be set up as against a third person unless these modifications of the original contract appear of record in accordance with section 144 of the same Law, and then, necessarily, they would appear from the certificate of the registrar, which must be attached to the initial petition filed in the proceeding and which the judge must have before him in order to authorize the issuance of the demand for payment.

In any event, the demurrer filed did not come within the scope of any of the eleven defenses mentioned in the former Law of Civil Procedure. In interposing this demurrer the petitioner followed the present procedure. We concede that it was not logical to follow any other procedure; but it does not seem to us that the exceptions of the old procedure could be pleaded or that any argument could properly be based thereon.

Under the procedure prescribed by the former Mortgage Law and the old Law of Civil Procedure, the collection of a mortgage credit was subject to delays and hindrances. It, of course, had the uncertainties and caused the anxieties which, unfortunately, seem to accompany all ordinary litigation. Something was needed to reduce such anxieties and uncertainties to a minimum; not with a view to creating a privileged class of creditors, but by reason of the importance inherent in land credits. Adverting to this need, it was said in the report accompanying the bill introduced in the Spanish Parliament on May 16, 1893, which bill later became our Mortgage Law:

"But where the voice of experience has been heard with the greatest clamor against the law, demanding immediate relief, is where it refers to the procedure for making mortgage debts effective. Its very complicated character, the uncertainty of results, and its incalculable cost restrain the investment of capital or suggest usurious conditions; sales with redemption clauses take the place of loans, with the object of avoiding all proceedings, to the prejudice of the landowner; interest is stipulated which trebles the capital loaned and perhaps, by the employment of other measures, the debtor is exposed to penal liability, thus converting the sanctity of laws enacted for the punishment of crime, into a vile instrument of avarice against the unfortunate. Distrust causes these means to be employed because the legal procedure does not satisfy the reasonable demands of trade, and to uproot these evils, to furnish land the capital it needs, and to give the lender assurances of prompt and easy recovery of his loans, is the object of the most important reform proposed by the Government, abolishing proceedings which, without positively guaranteeing one's rights, destroy those most sacred. Previous appraisement, uniformity of judicial jurisdiction in all necessary proceedings, only one summons and the immediate sale by auction, are the basis of the new law. We have abolished actions, letters requisitory, writs of attachment on property already mortgaged, incidental issues, simultaneous auctions, and a great many other barriers in the path of territorial credit, which had been placed there with the best of intentions, but which actually only tripped good faith."

In order to avoid such burdensome complexity, such expensive litigation, such uncertainty, resulting in the withdrawal of capital investments or in the execution of simulated contracts wherein the lenders, in an effort to protect their loans, sought to bind the borrower oppressively, there was created by virtue of this Mortgage Law a speedy and summary proceeding, and the first step of the reform was to discard the former complaint substituting therefor an initial petition. The next step was to permit that the formal demand for payment be served on the person lawfully in charge of the mortgaged property, if the debtor does not reside at the place where such property is located or if his domicile is unknown. All answers and incidental issues were eliminated and even the former judgment has been dispensed with, since the order made is a demand for payment and not an adjudication of rights. This would seem only proper, since the debt is acknowledged, the security subsists, the value of the property burdened with the lien is fixed beforehand and by agreement of the parties, and really no grounds are left for a possible objection or opposition to the proceedings except the three contingencies mentioned in article 175 of the Mortgage Law Regulations.

There is no conflict between the Mortgage Law and the Regulations. Furthermore, we find the following in the last paragraph of section 128 of the Mortgage Law:

"The Regulations for the execution of this law shall determine the other manners of procedure to be followed in these summary proceedings."

By virtue of that language the Mortgage Law itself has imparted to the Regulations all the authority required to govern this proceeding.

The Law is framed in general terms and the Regulations only follow, in unfolding the details, the intent and the spirit of that law. Accordingly, there are included in articles 168 to 176 of the Regulations provisions regarding the form and

requisites of the initial petition, jurisdiction, decision of the judge, etc., and among other indispensable requirements, such as are necessary to prevent a proceeding, originally intended as a summary one, from becoming an ordinary proceeding or at most an executory proceeding. For these reasons no discussion is allowed as to the title, the certainty, amount, and extinction of the obligation, which the law expressly reserves to an ordinary action, aided by the provisional attachment remedies provided, as may be seen from the above-quoted provisions excerpted from article 175 of the Regulations.

In *Giménez et al.* v. *Brenes,* 10 P.R.R. 124, 133, this Court upheld the validity of the Mortgage Law and the Regulations under the Organic Act of April 12, 1900; and it said:

"Section 8 of the said Organic Law provided that the Mortgage Law and its Regulations should continue in force, and therefore by implication Congress acknowledged that none of its articles could be repealed except by a special law, as provided by article 413 above cited. So that the whole of the Mortgage Law, and with it the express form of repeal, has the indisputable sanction of our Constitution passed by the Congress of the United States."

In that case it was also held that the special proceeding for the recovery of debts secured by mortgage is in force as regards the demand for payment on the debtor, but not regarding the distress, that is, the manner of selling the property encumbered. This doctrine was confirmed in *Banco Territorial y Agrícola* v. *Erwin,* 10 P.R.R. 388.

In *Cueto* v. *District Court of San Juan,* 37 P.R.R. 227, 229, it was held that in a mortgage foreclosure proceeding an answer and a cross-complaint to establish a homestead claim are not proper; and it was said:

". . . the defendants have no right to file in this summary foreclosure proceeding an answer or a cross-complaint because they are not related to any of the matters authorized under this proceeding and therefore it can not be decided therein whether there is an estate of homestead in the mortgaged property vested in the defendants

nor whether the execution creditor is bound to respect it. The pleading of the defendants requires an answer, a trial and a judgment to determine the question raised by them, that is, an ordinary action within a special and summary proceeding, which is at variance with the nature of the mortgage foreclosure proceeding and in opposition to the provisions of said section 175.''

Under these circumstances, it is proper for a judge to refuse to permit argument upon any demurrer, answer, or objection not expressly allowed by article 175 of the Mortgage Law Regulations, and in so doing no jurisdiction is exceeded or error committed justifying a reversal on certiorari. The writ issued must be discharged.

Mr. Justice Hutchison concurs in the result.